**Petition of NORTH FLORIDA TELEPHONE CO.**
Docket No. 74783-TP (CR). Order No. 6689.
Florida Public Service Commission.
**May 23 1975.**

Lewis W. Petteway, Tallahassee, for the petitioner.

The following commissioners participated in the disposition of this matter — WILLIAM T. MAYO, Chairman, WILLIAM H. BEVIS, PAULA F. HAWKINS.

BY THE COMMISSION.

Pursuant to notice the commission by and through its designated hearing examiner, held public hearings in this matter in February and March, 1975, in Live Oak, Hastings, High Springs and Tallahassee. All parties have been afforded an opportunity to be heard and to present their views concerning the matter involved herein. After reviewing the entire record, the commission now enters its order in this cause.

*Nature of proceedings*

By its petition in this docket, North Florida Telephone Company (hereinafter referred to as petitioner or company) seeks authority to increase its rates and charges so as to produce additional annual gross revenues of $1,785,000. Inasmuch as said petition and rate schedules were filed under §364.05, F.S., the commission exercised its authority thereunder and suspended said rate schedules by Order No. 6457, dated January 10, 1975, until further order of the commission. Thereafter, the company filed a motion for an immediate interim rate increase wherein it requested consent to the operation of the rate schedules designed to generate approximately $800,000 in additional annual gross revenues on an interim basis pending a final order in this proceeding.

Pursuant to notice, public hearings were held at various locations throughout the service area of the company in order to afford subscribers of the company an opportunity to be heard. An additional hearing was held with respect to the motion of the company. By agreement of the affected parties, that hearing considered both the interim and permanent requests by the company. This order, then, constitutes the final order in this proceeding as required by §364.05(4), F.S.

### The company and its position

The company is a Florida corporation with its principal headquarters in Live Oak, Florida, and holds certain certificates from this commission to provide telephonic communications from its 26 exchanges located in 13 counties throughout the northern portions of peninsular Florida. In 1969 it merged with, and became a subsidiary of, Mid-Continent Telephone Company. At the end of the test period, which is the 12 months ending September 30, 1974, the company provided local exchange telephone service to 36,681 telephones throughout its certificated areas. This represents an increase of approximately 6,500 stations since December 31, 1972, which was the end of the test period in its last general revenue proceeding.

In its petition, the company states that it needs to revise rates and charges so that it may be given the opportunity to earn under present economic conditions, a level of reasonable compensation for telephone service now being rendered. The company points out that its current rates were established by this commission in 1973 based on the company's financial position for the calendar year 1972. Increased operating costs, higher interest rates, the effects of inflation, coupled with the demand to provide increased service, have all contributed to an insufficient level of earnings which has necessitated the request for rate relief. Thus, it requests our consent to the operation of rate schedules which will produce $1,785,000 in additional annual gross revenues. This amount of revenue will result in an overall rate of return of 9.36%, which the company asserts is fair and reasonable under prevailing economic conditions.

In its request for interim rate relief, the company seeks sufficient revenues to enable it to continue to provide reliable service pending the lengthy regulatory process. It seeks, then, interim relief totaling approximately $800,000 which, contends the company, is essential until a final order is rendered in this proceeding.

### Rate base and earned rate of return

The company, through its exhibits, has reflected an adjusted rate base of $41,389,000, and net operating income during the test period

of $3,009,000. Thus, using the company's figures, the earned rate of return for the 12 months ending September 30, 1974 was 7.27%. We have, however, made a number of adjustments to rate base and net operating income, the result of which is to increase the actual rate of return to 7.49%. These adjustments are discussed separately hereinafter.

### 1. *Rate base adjustments*

We have first reduced the company's proposed cash working capital allowance by $22,000, which represents that portion of the allowance related to local exchange operations. Such an adjustment is necessary inasmuch as local exchange revenues are collected in advance thereby offsetting the need for a local exchange cash working capital allowance. Next, we have reduced the rate base by $70,000, which amount represents those monies accumulated and on hand for tax expenses not yet payable. Finally, it should be noted that we have utilized the investment dedicated to providing intrastate telephone service and have eliminated that portion which is applicable to interstate toll operations. Thus, the company's proposed net rate base has been reduced from $41,389,000 to $33,380,000, which represents that property used and useful in providing local telephone service to its subscribers. After giving consideration to the two adjustments discussed hereinabove, the net rate base upon which the company shall be given the opportunity to earn a fair and reasonable return is $33,288,000.

### 2. *Net operating income adjustments*

We have first increased intrastate operating income by $153,000, in order that the effect of toll revenue related to the pro forma adjustment is recognized, and in order to apply an 8.28% settlement ratio for the test period. Next, we have increased operating income in the amount of $35,000, which is necessary in order to normalize the maintenance expenses of the company. During the test period, the company's maintenance expense per main station was $72.25; it has agreed that a more representative cost is $65 per station. Thus, we have increased operating income to reflect more representative conditions. We have also increased operating income by $17,000 to correct an improper pro forma adjustment for the general accounting payroll, to eliminate an out-of-period consultant's fee, and to correctly allocate administrative and general expenses to the plant in service. Finally, we have increased income tax expenses by $105,000 to give recognition to the respective pro forma adjustments in this section of the order. It should be noted that we have utilized the operations dedicated to providing intrastate telephone service and have eliminated that portion which is applicable to interstate toll operation. Thus, the company's proposed operating

income has been reduced from $3,009,000 to $2,391,000 which represents the operation used and useful in providing intrastate telephone service to its subscribers. The effect of all of these adjustments is to increase net intrastate operating income to $2,491,000 for the 12 months ending September 30, 1974.

### 3. *Earned rate of return*

After giving consideration to the foregoing adjustments, simple mathematics indicate the company's earned intrastate rate of return during the test period was 7.49%.

### 4. *Cost of capital*

In this proceeding, the company, through its financial witness, has requested a return on common equity of 14.7% which would result in an overall rate of return of 9.36%. In the company's last general revenue proceeding in 1973, we authorized it to earn 11% on common equity and an overall rate of return of 6.30%. At that time, its embedded cost of debt was 4%. It has now increased to 4.41% and presumably will increase further in light of current interest rates. Recognizing the economic conditions which exist today, the petitioner's present cost of capital, and its ever increasing need to raise additional monies to meet its service requirements, we conclude that a return on equity within the range of 12% to 13% is a fair and reasonable return for company and will enable it to attract capital, to maintain and support its credit, and assure confidence in its financial soundness. In determining the cost of capital we have selected the midpoint of the zone, or 12.50%. Thus, using the company's adjusted capital structure as of September 30, 1974, the total cost of capital to the company is as follows —

|  | *Ratio* | *Rate* | *Cost* |
|---|---|---|---|
| Debt (REA) | 28.45% | 2.00% | 0.57% |
| Other LT Debt | 15.57 | 8.78 | 1.37 |
| Cost-Free | 6.62 | - 0 - | - 0 - |
| Equity | 49.36 | 12.0-13.0 | 5.95-6.42 |
|  | *100.00* |  | *7.86-8.36* |

It should be noted that we have adjusted the comany's proposed capital structure to eliminate $6,000,000 in advances from its parent company, which was included in long term debt. Such an adjustment is necessary inasmuch as the advances have no fixed interest rate but fluctuate with the movements of the prime interest rate, and have no specified term for repayment.

As noted above, the zone of reasonableness for the company is 7.86% to 8.36%. We shall use the midpoint, or 8.11%, for ascer-

taining the revenue requirements of the company. When that return is related to the adjusted rate base, simple mathematics reflect a gross revenue deficiency of $414,000. This amount must be tempered, however, by the Rates and Service Law, which is discussed in detail hereinafter.

## Service standards

The law of this state requires the commission to give consideration to service deficiencies, if any, when fixing the rates of the public utilities (§366.041, F.S.). In this proceeding, public hearings were held in Live Oak, High Springs and Hastings for the purpose of permitting subscribers of the company to testify regarding the adequacy and quality of service now being rendered by the company. Additionally, periodic service reports, prepared in accordance with our service standard rules, are hereby noticed judicially and are made a part of this record.

In our last proceeding involving this company we noted a number of service deficiencies which justified the invoking of the Rates and Service Law in order to insure that the level of service was upgraded to meet the standards which we have prescribed and which the customer expects. Thus, we withheld $87,000 in gross revenues pending a further evaluation of service by the commission. (Order No. 5936, dated November 16, 1973) Thereafter, by Order No. 6204, dated July 31, 1974, we authorized the company to increase its revenues by $87,000 inasmuch as the level of service had materially improved, the company had committed itself to make certain capital expenditures, and the revenues were necesary to permit financing of said improvements.

In the case at bar, we note that one area of concern in Docket No. 73012-TP was the company's toll switcher at Live Oak. Our service evaluation now reflects that said switcher is operating satisfactorily and internal controls have been implemented to insure its continued efficient operations. Of some concern to us is the compay's present method of handling changed number and operator intercept in certain tributary offices. We consider it to be deficient and the company should give consideration to providing dedicated trunk facilities in those offices not so equipped as soon as is practicable. We also note the company's proposed schedule for phasing out the remaining CX-1000 exchanges. The company has or will shortly replace two of the eight exchanges. However, it does not intend to complete this program until 1980 and has scheduled additions totaling approximately $115,000 to four of the exchanges during the phase-out period. Both of these plans are unsatisfactory. We question the prudence of placing additional investment in obsolete exchanges and view the 1980 completion date as too

lengthy a time to complete the project. Two years rather than five appears to be a more reasonable time in which to accomplish this goal. With respect to held orders for regrades or new service, we recognize that the company has diligently sought to correct this area of deficiency. Moreover, with the cutting in of the new exchanges, this problem should be eliminated. Finally, at our urging, the company has initiated new reporting procedures for various circuits in order to eliminate many of the problems raised by subscribers during the public hearings.

Our evaluation of service as a whole indicates the company has achieved a number of significant service improvements. However, we are concerned with a number of areas which still remain deficient, as noted above. We cannot, at this time, grant the total revenues which the company needs in order to achieve a return of 8.11% in view of these deficiences noted in the record. We are, however, retaining jurisdiction in this docket for the purpose of evaluating the service of the company and if deemed necessary, to take additional testimony regarding any corrections or efforts by the company to satisfy these deficiencies. Thus, we are withholding $226,000 of the revenue requirements by virtue of §366.041, F.S., pending further evaluation and hearings, if necessary.

### Service charges

In its last proceeding, we questioned the level of charges related to services provided by its parent, as well as the manner in which said charges were allocated to the company. We made no adjustment at that time, but expressed our concern with the fact that little, if any, justification or detail was supplied by the company to support these costs. In this proceeding, the record reflects that $273,000 in service charges were allocated by the parent to the company. The company has attempted to justify the reasonableness of the charges but again has failed to demonstrate the basis for such allocation, the services received by it for such charges, the reasonableness of the level of charges, or adequate details concerning the charges. We are, then, withholding $80,000 of the total revenue requirements pending receipt of an exhibit which adequately supports said charges. Inasmuch as this docket is being held open for further service evaluation, consideration can also be given to the exhibit filed by the company and rate relief, if warranted, can then be granted.

### Tariff revisions

The company has filed proposed tariff revisions designed to generate the full amount of revenue requested herein. Since we are authorizing only a portion thereof. some revision of the company's

tariffs is necessary. The company is therefore directed to file appropriate tariff revisions designated to generate the amount of revenues which we are authorizing. In line with this revision the commission is only going to allow these increases to be placed on non-recurring services, i.e., service connections, moves, changes and restorals.

The company's witness admitted on cross-examination some of the costs were not being recovered on these non-recurring charges. We request that they file as a late filed exhibit (Exhibit 32) which would separate the service connection charges into work function; service order charges, equipment work charges and access line charges. At the hearing in Tallahassee we requested and were supplied with further breakdown of cost for these service connection charges particularly the differentials between business and residence. The figures supplied revealed for the most part the cost would be recovered for installing telephone service. As we stated many times, cost should be recovered where cost is incurred. We therefore believe such charges should be compensatory for service connection charges and that there should be differential in service order charges for business and residence.

We further find that a breakdown on the equipment work charges should reflect the cost of service principally. There should be a residential equipment work charge which would include provisions for previously covered residences to receive a credit for this work. The credit will be a reduction from the tariff rate, if the residence had been previously wired and the equipment located thereon is in good working order.

We also find that a service restored charge as proposed for business and residential customers where services have been suspended for non-payment of bills should be imposed in the amount of $10.

The commission finds that the differential between "moves" and "changes" of residential or business installation and extension should be eliminated. In other words, a main station or extension will carry the same charges, if the customer requests the service changed. We also find that sections 24 and 27 should be deleted from the general exchange tariff.

We therefore find that tariff rates and schedules should be filed in line with the findings above. We further find that subject to the filing and approval of appropriate revised tariffs they will go into effect no sooner than five days from the date of this order.

It is therefore ordered that each and all of the specific findings herein be and the same are hereby approved in every respect.

It is further ordered that the petition of North Florida Telephone Company be and it is hereby granted, in part, and the company is

hereby authorized to adjust its rates and charges so as to produce $108,863.00 in additional annual gross revenues.

It is further ordered that the petitioner file with this commission, for our approval, appropriate tariff revisions consistent with our findings herein.

It is further ordered that the commission shall retain jurisdiction in this docket for the purpose of evaluating the level of service of the company, for receiving and reviewing the documentation of the company as it relates to the service charges allocated to it by its parent company, for holding further hearings, if necessary, and for such other purposes as the commission may deem appropriate.